THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE NON-PARTY DEPOSITION )
SUBPOENA )
)
AUTO-ISAC, INC. )
c/o Booz Allen Hamilton, Inc. )
901 15th Street, N.W. )
Washington, D.C.  20005 )
Movant. )
)
)
BRIAN FLYNN, Belleville, IL; )
GEORGE and KELLY BROWN, )
Pacific, MO; and )
MICHAEL KEITH, Montague, MI )
)
Plaintiffs, )
v. )
)
FCA U.S. LLC f/k/a CHRYSLER GROUP )
LLC, Auburn Hills, MI and )
HARMAN INTERNATIONAL )
INDUSTRIES, INC., Stamford, CT )
)
Defendants. )
)

Case No. _____

United States District Court,
Southern District of Illinois,
C.A. No. 3:15-cv-00855

**MEMORANDUM OF LAW OF NON-PARTY AUTO-ISAC IN SUPPORT OF MOTION
TO QUASH THIRD-PARTY SUBPOENA DUCES TECUM**

**INTRODUCTION**

Pursuant to Rule 45(d)(3) of the Federal Rules of Civil Procedure, Auto-ISAC, Inc. (the

"Auto-ISAC"), by and through its undersigned counsel, respectfully moves this Court to quash

the subpoena directing the Auto-ISAC to produce documents in a civil action (the "Subpoena").

The Subpoena was issued by Plaintiffs Brian Flynn, George Brown, Kelly Brown, and Michael Keith (collectively, "Plaintiffs") in the above-captioned litigation pending in the United States District Court for the Southern District of Illinois (the "Underlying Action"),[1] and service of the Subpoena was accepted by counsel for the Auto-ISAC,[2] which is not a party in the Underlying Action.  The Subpoena commands the Auto-ISAC to produce documents on September 28, 2016[3] at a location in Washington, D.C.  In particular, the Subpoena directs the Auto-ISAC to produce "Documents reviewed, considered, published or otherwise related to Auto-ISAC's creation of the automotive cybersecurity 'Best Practices[,]' which [were] published in the summer of 2016" and "Communications with FCA from June, 2010 to the present."

The Auto-ISAC moves to quash the Subpoena because (1) it seeks information that lacks relevance to the Underlying Action, (2) it imposes an undue burden on the Auto-ISAC, and (3) the Auto-ISAC's compliance with the Subpoena would require it to disclose confidential and proprietary information and thereby cause undue societal harm.

## BACKGROUND

Plaintiffs seek to subpoena documents from the Auto-ISAC, in connection with the Underlying Action they filed against FCA US LLC and Harman International Industries, Incorporated (together, the "Defendants") on August 4, 2015.  Plaintiffs filed the Underlying Action approximately two weeks after two cybersecurity researchers demonstrated that they had engineered a way to control a Jeep Cherokee vehicle remotely.  *See* Class Action Complaint,

---

[1] On Friday, September 23, 2016, the court in the Underlying Action issued two orders dismissing multiple of the Plaintiffs' claims and directing two of the Plaintiffs (George and Kelly Brown) to arbitrate their claims against the Defendants.  *See* Memorandum and Order, *Flynn v. FCA US LLC*, No. 3:15-cv-855 (S.D. Ill. Sept. 23, 3016), ECF No. 114 (compelling arbitration of the claims of Plaintiffs George and Kelly Brown) (attached as Appendix A); Memorandum and Order, *Flynn v. FCA US LLC* (Sept. 23, 2016), ECF No. 115 (dismissing many of the claims brought by Plaintiffs Brian Flynn and Michael Keith in the Amended Complaint) (attached as Appendix B).
[2] As explained further below, the Auto-ISAC's counsel agreed to accept service of the Subpoena on behalf of the Auto-ISAC.  *See* Appendix J.
[3] This date reflects modifications to the Subpoena that are discussed below.

*Flynn v. FCA US LLC* (Aug. 4, 2015), ECF No. 1 (attached as Appendix C) and Amended Class

Action Complaint, *Flynn v. FCA US LLC* (Dec. 22, 2015), ECF No. 49 ("Amended Complaint")

(attached as Appendix D).[4]   In their lawsuit, Plaintiffs assert, among other things, that (1) the

hacked vehicles suffer from alleged design defects that make them susceptible to hacks, (2) the

Defendants knew about the alleged design defects since 2011, and (3) the Defendants failed to

disclose the alleged defects between 2011 and July 2015.  *See* Appendix D ¶¶ 1-2.

      The Auto-ISAC is not a party to the Underlying Action.  Indeed, it did not exist when the

Plaintiffs filed their case.  The Auto-ISAC, a non-profit organization, was incorporated on

August 17, 2015.  *See* Certificate of Incorporation of Auto-ISAC, Inc. (Aug. 17, 2015) (attached

as Appendix E).   In July 2014, the National Highway Traffic Safety Administration ("NHTSA")

"challenged the automotive industry to form an Information Sharing and Analysis Center

("ISAC") to help the industry proactively and uniformly address cybersecurity threats."

NHTSA, NHTSA and Vehicle Cybersecurity, 4 (attached as Appendix F).  NHTSA encouraged

the industry to form the Auto-ISAC because it believed that "an automotive Industry ISAC is a

critical piece of vehicle cybersecurity infrastructure."  *Id.*

      In October 2014, NHTSA published *Assessment of the Information Sharing and Analysis

Center Model*, a report discussing the effective implementation of Information Sharing and

Analysis Centers and explaining how an ISAC could be formed for the automobile industry.  *See*

NHTSA, *Assessment of the Information Sharing and Analysis Center Model*, DOT HS 812 076

(Oct. 2014) (attached as Appendix G).  The report states that the mission of an ISAC is to

"enhance the ability of the sector to prepare for and respond to cyber threats, vulnerabilities and

incidents, by providing a centralized organization to monitor, disseminate information, and help

---

[4] Subsequent citations to documents will refer to the appendix in which the document is located.

mitigate cyber security risks and provide protection." *Id.* at 6. An ISAC's "primary objective is to get accurate, actionable, and relevant critical information to the most comprehensive range of those that need the information," and its "strong secondary objective is to keep this information confidential and away from malicious people." *Id.* To maintain the confidentiality of an ISAC's information, the report further explains, it "must be available to all appropriate (based on membership definitions) parties, yet it must be protected (i.e., kept out of hands of malicious people, and not arbitrarily re-distributed to unauthorized individuals)." *Id.* at 18.

An organization's participation in an ISAC or other initiative to share cybersecurity information is voluntary. The Federal Government has established both executive and legislative policies to support the confidential information sharing that is at the heart of the Auto-ISAC's purpose. In February 2015, President Obama signed Executive Order 13691 on *Promoting Private Sector Cybersecurity Information Sharing* (attached as Appendix H). The Order recognized that "[o]rganizations engaged in the sharing of information related to cybersecurity risks and incidents play an invaluable role in the collective cybersecurity of the United States." *Id.* To promote this vital activity, the Order noted that "[s]uch information sharing must be conducted in a manner that protects the privacy and civil liberties of individuals, *that preserves business confidentiality*, that safeguards the information being shared, and that protects the ability of the Government to detect, investigate, prevent, and respond to cyber threats to the public health and safety, national security, and economic security of the United States." *Id.* (emphasis added).

In December 2015, President Obama signed legislation containing the Cybersecurity Information Sharing Act of 2015, which reflects a congressional imperative to promote participation in information sharing initiatives. The law includes several confidentiality

protections.  Among other things, the Act exempts information that organizations share with

governmental entities from disclosure through the Freedom of Information Act, non-federal

freedom of information laws, open government laws, sunshine laws, or any other similar laws

that require the disclosure of information or records.  *See* Pub. L. 114-113 §§ 104-105, 129 Stat.

2936, 2941-2950 (2015).  The law also requires an entity "monitoring an information system,

operating a defensive measure, or providing or receiving a cyber threat indicator or defensive

measure . . . [to] implement and utilize a security control to protect against unauthorized access

to or acquisition of such cyber threat indicator or defensive measure." *Id.* §104(d).  Moreover,

the law states that providing "cyber threat indicators and defensive measures to the Federal

Government . . . shall not constitute a waiver of any applicable privilege or protection provided

by law, including trade secret protection." *Id.* §105(d)(1).  Similarly, the law requires any non-

federal entity receiving cyber threat indicators or defensive measures from another non-federal

entity to comply with "lawful restrictions" that the sharing entity places on the sharing or use of

the information. *Id.* §104(c)(2).  Such restrictions include designations that information is

commercial, financial, or proprietary and apply to information shared with an ISAC.

The Auto-ISAC aspires to play an important role in promoting cybersecurity throughout

the automotive industry.  On July 21, 2016, the Auto-ISAC released a document entitled,

*Automotive Cybersecurity Best Practices Executive Summary* (the "July 2016 Best Practices

Document") (attached as Appendix I).  The document  expands on the "Framework for

Automotive Cybersecurity Best Practices . . . published in January 2016 by the Alliance of

Automobile Manufacturers . . . and the Association of Global Automakers," *id.* at 2,  and

specifies at least 15 sources of cybersecurity guidance for its best practices, *see id.* at 4-8.  The

July 2016 Best Practices Document emphasizes that it does not constitute a compliance

document or set minimum standards. *Id.* at 3. For example, it states in part that its best practices "do not form an assessment or compliance framework, and do not mandate prescriptive requirements. Each automaker will determine if and/or how to apply the Best Practices internally." *Id.* at 3.

On August 8, 2016, Plaintiffs served a subpoena on the Auto-ISAC's registered agent commanding the production of documents in Delaware on August 25, 2016 (the "Delaware Subpoena") (attached as Appendix J). In particular, the Delaware Subpoena requested that the Auto-ISAC produce the following:

> 1. All documents submitted to or provided to Auto-ISAC in connection with its research or work on cybersecurity in the motor vehicle ecosystems, excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles.
>
> 2. All documents considered by Auto-ISAC in connection with its research or work on cybersecurity in the motor vehicle ecosystems, excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles.
>
> 3. All communications between Auto-ISAC and any automobile manufacturer, specifically including FCA, regarding cybersecurity in the motor vehicle ecosystems, excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles.

*Id.* According to the Delaware Subpoena, the "relevant time period for these requests is June 2010 to present." *Id.* The place of production for the Delaware Subpoena was more than 100 miles from the Auto-ISAC's location in Washington, D.C., which did not comply with Fed. R. Civ. P. 45(c)(2). Rather than file a motion to quash the Delaware Subpoena, the Auto-ISAC's counsel informed Plaintiffs' counsel of this defect (in addition to other concerns about the scope of the subpoena).

Plaintiffs subsequently emailed a second subpoena (the "D.C. Subpoena") to the Auto-ISAC's counsel, who had agreed to accept service of the subpoena on behalf of the Auto-ISAC.

*See* Appendix K (including both Plaintiff's email and the attached second subpoena). The D.C.

Subpoena was virtually identical to the Delaware Subpoena, except that it designated a place of

production in Washington, D.C. and bore a production date of September 20, 2016. *Compare*

Appendices J and K.

On September 12, 2016, Plaintiffs' counsel essentially amended the D.C. Subpoena,

limiting it to (1) "Documents reviewed, considered, published or otherwise related to Auto-

ISAC's creation of the automotive cybersecurity 'Best Practices' which was published in the

summer of 2016" and (2) "Communications with FCA from June, 2010 to the present." Email

from Plaintiffs' counsel to Auto-ISAC's counsel (Sept. 12, 2016) (attached as Appendix L). On

September 17, 2016, Plaintiffs' counsel subsequently agreed to extend the response date for the

amended D.C. Subpoena to September 28, 2016. Email from Plaintiffs' counsel to Auto-ISAC's

counsel (Sept. 17, 2016) (attached as Appendix M.)

Undersigned counsel and Plaintiffs' counsel have had several communications about the

subpoenas, the sensitive mission of the Auto-ISAC, the scope of Plaintiffs' request, and the

possibility that the Auto-ISAC would oppose the Subpoena. Among other things, the

undersigned counsel has asked Plaintiffs' counsel to withdraw its Subpoena. Email from Auto-

ISAC's counsel to Plaintiff's counsel (Aug. 31, 2016) (attached as Appendix N). Plaintiffs'

counsel declined that request. Email from Plaintiffs' counsel to Auto-ISAC's counsel (Sept. 5,

2016) (attached as Appendix O).

## ARGUMENT

### I.   THE SUBPOENA SHOULD BE QUASHED BECAUSE THE PLAINTIFFS SEEK IRRELEVANT INFORMATION

The Federal Rules of Civil Procedure provide that "[p]arties may obtain discovery

regarding any nonprivileged matter *that is relevant to any party's claim or defense*." Fed. R.

Civ. P. 26(b)(1) (emphasis added). But "discovery may not be had on matters irrelevant to the subject matter involved in the pending action." *Miscellaneous Docket Matter 1 v. Miscellaneous Docket Matter 2*, 197 F.3d 922, 925 (8th Cir. Minn. 1999) (citing Fed. R. Civ. P. 26(b)(1)); *see Norguard Ins. Co. v. Serveon Inc.*, 2011 WL 344076, at *4 (D. Del. Jan. 28, 2011) (explaining that the scope of discovery extends to "any nonprivileged matter that is relevant to any party's claim or defense"). "Relevance is measured not by admissibility, but by whether the information 'bears on, or . . . reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Norguard Ins. Co.*, 2011 WL 344076, at *4 (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

As discussed below, the amended D.C. Subpoena seeks only information that is irrelevant to the Underlying Action.

### A.    There is No Reasonable Basis to Assert that the Auto-ISAC's Communications with FCA are Relevant to the Underlying Action

The Underlying Action focuses on events that occurred before the Plaintiffs filed suit on August 4, 2015. The Auto-ISAC did not even exist until August 17, 2015. Thus, the D.C. Subpoena's request for information about communications between the Auto-ISAC and FCA from June 2010 until the present is facially irrelevant. No communications could have occurred between the two entities before the Plaintiffs filed the Underlying Action.

### B.    Any Additional Information that the Auto-ISAC Considered in Drafting the July 2016 Best Practices Document is Irrelevant to the Underlying Action

The July 2016 Best Practices Document is not a compliance document, sets no minimum cybersecurity standards, and was drafted after the occurrence of the events that are the focus of the Underlying Action. In addition, the public document includes the names of multiple organizations with which the Auto-ISAC collaborated and citations for many of the resources

that it considered.  *See* Appendix I at 4-8.  Thus, to the extent that the Plaintiffs seek the

"[d]ocuments reviewed, considered, published or otherwise related to Auto-ISAC's creation of

the automotive cybersecurity 'Best Practices,'" their request includes information that has been

publicly disclosed.  In a section entitled "Authority and Related References," the document

provides an overview of its sources:

> The Best Practices incorporate concepts from other standards and frameworks
> created by the National Institute of Standards and Technology (NIST),
> International Organization for Standardization (ISO), SAE International, and
> other organizations.  Many of the Best Practices either build on established ideas
> in those references or are adapted to address unique dimensions of the motor
> vehicle ecosystem.

Appendix I at 3.

More specifically, the eight-page document discloses that it reflects the consideration of

established resources and the following guidance (among other sources):

1. Framework for Automotive Cybersecurity Best Practices by the Alliance of
   Automobile Manufacturers and the Association of Global Automakers;

2. ISO/IEC 27001—Information Security Management;

3. NIST 800-30: Guide for Conducting Risk Assessments;

4. SAE J3061: Cybersecurity Guidebook for Cyber-Physical Vehicle Systems;

5. NIST 800-64: Security Considerations in the Systems Development Lifecycle;

6. NIST SP 800-121 Guide to Bluetooth Security;

7. NIST SP-127: Guide to Securing WiMAX Wireless Communications;

8. ISO 17799: Mobile Phone Security;

9. NIST 800-137: Information Security Continuous Monitoring for Federal
   Information Systems and Organizations;

10. ISO/IEC 30111: Vulnerability Handling Procedures;

11. NIST SP 800-61: Computer Security Incident Handling Guide;

12. ISO/IEC 27035:2011 Information Security Incident Management;

13. NIST SP 800-50: Building an Information Technology Security Awareness and
    Training Program;

14. NIST SP 800-150: Guide to Cyber Threat Information Sharing; and

15. ISO/IEC 27010:2012—Information Security Management for Inter-sector and
    Inter-organizational Communications.

Appendix I, at 2, 4-8.

All of the above resources have been disclosed to the Plaintiffs (and to anyone else who read the July 2016 Best Practices Document), and not one of the disclosed resources provides any relevant information about whether, between 2010 and 2015, FCA's vehicles suffered from alleged design defects that made them susceptible to hacks, the Defendants knew about any such alleged defects, or the Defendants failed to disclose such alleged defects. To the extent the Auto-ISAC considered similar resources that it did not specify in the July 2016 Best Practices Document, that information also lacks relevance to the Underlying Action. Plaintiffs would be hard-pressed to argue otherwise.

## II.   THE SUBPOENA'S REQUEST FOR COMMUNICATIONS BETWEEN FCA AND THE AUTO-ISAC SHOULD BE QUASHED BECAUSE IT WOULD SUBJECT THE AUTO-ISAC TO AN UNDUE BURDEN

Even if Plaintiffs' request for communications between FCA and the Auto-ISAC sought relevant information, the Court should quash it. Rule 45 mandates that the party serving a subpoena take reasonable steps to avoid imposing an undue burden on the recipient. *See* Fed. R. Civ. P. 45(d)(1). When determining whether a subpoena imposes an undue burden on a third

party, courts consider "not only the potential burden to the producing party, but [also] the necessity of the information for the party seeking production, and whether the information can be obtained from other, more convenient sources." *Cash Today of Texas, Inc. v. Greenberg*, 2002 WL 31414138, at *4 (D. Del. Oct. 23, 2002).  To be sure, there is no "absolute rule providing that a party must first seek those documents from an opposing party before seeking them from a non-party." *E.E.O.C. v. Premier Well Services*, LLC, 2011 WL 2198285 at *1 (E.D. Ark. June 3, 2011).  Nonetheless, a court "must limit the frequency or extent of discovery otherwise allowed by [the] rules if it determines . . . the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).  Indeed, some courts have held that "[i]f the party seeking the information can easily obtain the same information without burdening the nonparty, the court will quash the subpoena." *See Precourt v. Fairbank Reconstruction Corp.*, 280 F.R.D. 462, 467 (D.S.D. 2011) (citing *Cantrell v. U.S. Bioservices Corp.*, 2009 WL 1066011 at *2 (W.D. Mo. 2009).

Plaintiffs have sought communications between non-party Auto-ISAC and FCA, a defendant in the Underlying Action.  Plaintiffs cannot meet their burden of demonstrating an inability to obtain the requested communications from another "source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).  In fact, they have made substantially the same request to FCA.  In particular, Plaintiffs acknowledge that they have already requested from FCA "All communications between [FCA] and the Automotive Information Sharing and Analysis Center ("Auto-ISAC"), Inc. regarding cybersecurity between June 2010 to present, excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles." Email from Plaintiffs' counsel to Auto-ISAC's

counsel (Sept. 15, 2016) (attached as Appendix P).  Plaintiffs' request to the Auto-ISAC for

communications between FCA and the Auto-ISAC is not only irrelevant; it creates an undue

burden due to its duplicative nature.

## III.   THE SUBPOENA SHOULD BE QUASHED BECAUSE COMPLYING WITH IT WOULD REQUIRE THE AUTO-ISAC TO DISCLOSE CONFIDENTIAL AND PROPRIETARY INFORMATION AND THEREBY IMPOSE AN UNDUE BURDEN

In general, the Subpoena should be quashed because it fundamentally seeks to access the

Auto-ISAC's confidential information and thereby imposes an undue societal burden.  Rule 45

permits the Court to quash or modify a subpoena if it requires the recipient to disclose a trade

secret or other confidential research, development, or commercial information.  *See* Fed. R. Civ.

P. 45(d)(3).  A fundamental purpose of the Auto-ISAC is to share confidential information about

cybersecurity threats, vulnerabilities, defenses, and research, among other things.  NHTSA's

*Assessment of the Information Sharing and Analysis Center Model* highlights the need to restrict

the information that ISACs collect and share from access by unauthorized parties.  *See* Appendix

G.  And the Cybersecurity Information Sharing Act of 2015 includes protections to safeguard

shared information from disclosures that would undermine the trust of entities that provide

information, as well as to prevent malicious individuals from accessing it.  Pub. L. 114-113 §§

104-105, 129 Stat. 2936, 2941-2950 (2015).  The sheer expansiveness of Plaintiffs' original

subpoena is telling.  It was not restricted to FCA's vehicles or to the time before Plaintiffs

brought the Underlying Action.  Instead, it requested **all** of the Auto-ISAC's cybersecurity

research documents about **any** automobile made by **any** automaker from 2010 **until the present**.

In the Plaintiffs' own words, the Delaware Subpoena and the subsequent D.C. Subpoena

requested, for the time frame June 2010 to the present:

1. **All documents submitted to or provided to Auto-ISAC in connection with**

**its research or work on cybersecurity in the motor vehicle ecosystems,** excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles.

2. **All documents considered by Auto-ISAC in connection with its research or work on cybersecurity in the motor vehicle ecosystems,** excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles.

3. **All communications between Auto-ISAC and any automobile manufacturer, specifically including FCA,** regarding cybersecurity in the motor vehicle ecosystems, excluding any such documents that relate exclusively to the cybersecurity of autonomous ("self-driving") vehicles.

Appendices J and K (emphasis added). The above requests are a bare attempt to grab the Auto-ISAC's confidential information about automakers' cybersecurity. Although Plaintiffs have narrowed their requests since issuing their original subpoena, the Subpoena's request for plainly irrelevant and duplicative information suggests an enduring motivation to obtain the Auto-ISAC's confidential information. To the extent the Subpoena seeks such information, it should be quashed.

The Subpoena also should be quashed for a related reason: allowing Plaintiffs to obtain the Auto-ISAC's confidential information will impose an undue burden on societal interests. Simply put, if companies believe that confidential information that they provide to ISACs will be easily accessible through third-party subpoenas, they will not provide such information. *See, e.g.*, Karen E. Jones, Comment and Casenote: *The Effect of The Homeland Security Act on Online Privacy and The Freedom Of Information Act*, 72 U. Cin. L. Rev. 787, 805 (2003) (arguing that a FOIA disclosure "exemption is desirable because it ensures that private entities have no reason to withhold information regarding critical infrastructure from the government").

In *In re Fosamax Prods. Liab. Litig.*, 2009 WL 2395899 (S.D.N.Y. Aug. 4, 2009), a district court considered the societal consequences in quashing the plaintiffs' third-party

subpoena to depose an independent medical researcher who performed uncompensated work for the National Academy of Sciences, a non-profit organization. In determining whether the burden of the subpoena outweighed its necessity, the court acknowledged that upholding the subpoena would impose a personal hardship on the researcher, but it emphasized that "*the resulting social impact would be far more serious.*" *Id.* at *4 (emphasis added). The court reasoned that "[c]ompelling testimony from a third-party researcher risks chilling participation in beneficial public research." *Id.* Here, to grant Plaintiffs' Subpoena would risk chilling not only the active participation of automakers and other companies in the vital information sharing facilitated by the Auto-ISAC; it would risk the engagement of other organizations, in other industries, with other ISACs and information sharing initiatives.

## IV.   THE PROTECTIVE ORDER IN THE UNDERLYING ACTION IS INSUFFICIENT TO COMPENSATE FOR THE IMPACT OF COMPLYING WITH THE SUBPOENA

Although there is a protective order in place in the Underlying Action (*see* Appendix Q), its existence cannot compensate for the impact of complying with the Subpoena. As the number of entities that receive information increases, so does the probability that it will be disclosed inappropriately or misused. *See, e.g.*, *Weakley v. Redline Recovery Servs.*, LLC, 2011 WL 1522413, *2 (S.D. Cal. Apr. 20, 2011) (sanctioning attorney for disclosing Social Security numbers of the opposing party). And, as discussed above, the Auto-ISAC's compliance with the Subpoena will have a chilling effect on its members' willingness to share information voluntarily, which is essential to fulfilling its mission. As the court reasoned in *Fosamax*, the "perception of intrusion into the domain of the [researcher] would carry a substantial risk of chilling," so "quashing the subpoena is the most appropriate protective measure in this case." 2009 WL 2395899, at *5. In the present matter, granting Plaintiffs' Subpoena would create the perception of intrusion into the domain of the ISAC, chilling the very information sharing that justifies its existence.

## **CONCLUSION**

For the foregoing reasons, the Auto-ISAC respectfully requests that this Court quash the

Subpoena.

Dated: September 27, 2016

Respectfully submitted,

Andrew Tauber (D.C. Bar No. 495980)
Marcus A. Christian*
*Admission pending
MAYER BROWN LLP
1999 K Street, NW
Washington, DC  20006-1101
Phone: (202) 263-3000
Fax: (202) 263-3300

*Attorneys for* Auto-ISAC, Inc.

15

## CERTIFICATE OF SERVICE

I, Andrew Tauber, counsel for movant Auto-ISAC, Inc., and a member of the Bar of this

Court, certify that on this 27th day of September, 2016, I caused a copy of the Motion to Quash

Third Party Duces Tecum to be served by overnight mail on the following:


Stephen R. Wigginton
Christopher D. Baucom
Lucas Pendry
Armstrong Teasdale LLP
7700 Forsyth Blvd.
St. Louis, MO 61305

IJay Palansky
Armstrong Teasdale LLP
4643 S. Ulster Street, Suite 800
Denver, CO 80237

Emily Buckley
Armstrong Teasdale LLP
3115 Wyandot Street
Denver, CO 80211

Christopher F. Cueto
Michael J. Gras
Law Office of Christopher Cueto , LTD
7110 West Main Street
Belleville, IL 62223

Lloyd M. Cueto
Law Office of Lloyd M. Cueto, P.C.
7110 West Main Street
Belleville, IL 62223

*Counsel for Plaintiffs Brian Flynn, George Brown and Kelly Brown*

Stephen R. Wigginton
Christopher D. Baucom
Armstrong Teasdale LLP
7700 Forsyth Blvd.
St. Louis, MO 61305

*Counsel for Plaintiff Michael Keith*

Kathy A. Wisniewski
Stephen A. D'Aunoy
John W. Rogers
Scott H. Morgan
Sharon B. Rosenberg
Thompson Coburn
One US Bank Plaza, 26th Floor
St. Louis, MO 63101-2183

*Counsel for Defendant FCA US LLC*

Andrew Blair Fromm
John R. Trentacosta
Vanessa L. Miller
Foley & Lardner LLP
500 Woodward Ave., Suite 2700
Detroit, MI 48226-3489

Elizabeth Mazzocco
William J. McKenna , Jr.
Foley & Lardner, LLP
321 North Clark Street, Suite 2800
Chicago, IL 60654

Michael D. Leffel
Foley & Lardner
150 East Gilman Street
Post Office Box 1497
Madison, WI 53703-1481

*Counsel for Defendant Harman International Industries, Inc.*

I further certify that all parties required to be served have been served.

_____
Andrew Tauber